**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSHUA ROBERT LAWRENCE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   22-cv-4995** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **October 30, 2023**

Plaintiff brought this action seeking review of the Acting Commissioner of Social Security Administration's decision denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 9) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed for DIB, alleging disability since August 11, 2019, due to spinal fusion, slipped disc, and degenerative disc disease.  (R. 257-62, 268-74, 288).  Plaintiff's application was denied at the initial level and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 141-44, 146-58).  Plaintiff, represented by counsel, and a vocational expert testified at the September 10, 2021 administrative hearing.  (R. 38-83).  On October 1, 2021, the ALJ issued a decision unfavorable to Plaintiff.  (R. 9-37).  Plaintiff appealed the ALJ's decision, but the Appeals Council denied Plaintiff's request for

review on October 14, 2022, thus making the ALJ's decision the final decision of the
Commissioner for purposes of judicial review.  (R. 1-6).

Plaintiff filed a complaint in the United States District Court for the Eastern District of
Pennsylvania on December 15, 2022.  (Compl., ECF No. 1).  On April 7, 2023, Plaintiff filed a
Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 9).  The
Commissioner filed a response on June 7, 2023.  (Def.'s Br., ECF No. 12).  On July 28, 2023,
this matter was reassigned to me, and Plaintiff consented to my jurisdiction.  (Order, ECF No.
13; Consent, ECF No. 15).


II.     **FACTUAL BACKGROUND**

The Court has considered the administrative record in its entirety and summarizes here
the evidence relevant to the instant request for review.

Plaintiff was born on July 23, 1984 and was thirty-five years old on the alleged disability
onset date.  (R. 268).  He completed two years of college and has worked as a finishing operator,
general helper, and utility operator in the chemical industry and as a route sales manager for a
bread business.  (R. 289).

A.     **Medical Evidence**

On August 14, 2019, Plaintiff was seen by James Guille, M.D., an orthopedist and sports
medicine physician, for bilateral knee pain.  (R. 517).  The next day Plaintiff reported low back
pain on the left side, which he rated at a moderate 6/10.  (R. 514).  He described the pain as very
deep inside the lower back, with occasional numbness/tingling in the legs and electric shocks in
the right posterior thigh while sitting.  (*Id.*).  The pain was constant, burning, dull, sharp,
stabbing, throbbing, aching, and cramping, and additional symptoms included numbness,
stiffness, weakness, swelling, instability, sleep disturbances, range of motion limitations,

difficulty walking, and radiation of pain.  (*Id.*).  The symptoms were both relieved and worsened while resting.  (*Id.*).  On physical examination of his lumbar spine, range of motion was decreased secondary to stiffness, hyperextension caused increased pain, pain was reported with left and right side bending, and the gait pattern was stiff.  (R. 515).  Dr. Guille assessed L5-S1 anterolisthesis and bilateral pars fractures L5.  (R. 516).  An August 23, 2019 MRI of the lumbar spine revealed slight grade 1 anterolisthesis, chronic bilateral spondylolysis, a small to moderate bulge, moderate right neural foraminal narrowing, and mild left neural foraminal narrowing.  (R. 529).  The MRI also showed mild spinal stenosis and a small disc extrusion.  (*Id.*).

Plaintiff returned to Dr. Guille for follow-up appointments for his worsening back pain in August, September, and October of 2019.  (R. 505-13).  The orthopedist's physical examinations indicated that range of motion was deceased secondary to stiffness and pain, hyperextension caused increased pain, left and right side bending caused pain, gait was stiff or antalgic, extensor hallucis longus strength was 4/5 on the right, straight-leg testing was positive, and shooting pains were reported down the right posterior thigh.  (R. 505-13).  Dr. Guille told Plaintiff that "the only way his symptoms will fail to progress is by surgical intervention."  (*Id.*).  Conservative treatment measures were attempted, such as physical therapy, but were unsuccessful, with the physical therapy causing him increased pain.  (*Id.*).  Plaintiff consented to surgery.  (*Id.*).

On September 4, 2019, Plaintiff's primary care physician, William Taddonio, M.D., examined Plaintiff.  (R. 561).  The examination findings were all unremarkable.  (*Id.*).  Plaintiff was seen by Shiny Parambath, C.R.N.P. on October 9, 2019 at his primary care physician's office for preop clearance.  (R. 569).  The results of the examination were normal.  (R. 575-76).

On November 13, 2019, Plaintiff was admitted to Pottstown Hospital for surgery due to spondylolithiasis, lumbosacral region, and spondylolisthesis at L5-S1.  (R. 415).  He underwent posterior spinal fusion with instrumental L4-sacrum, bilateral laminectomy, foraminotomy, and

facetectomies at L5-S1.  (R. 433).  During his hospitalization, he was observed ambulating in his room and his pain was well-managed with him rating his back pain at a 4/10 with left foot numbness and tingling.  (R. 416, 427).  Plaintiff was feeling well when he was discharged on November 18, 2019.  (R. 416).

Until February 2020, Plaintiff reported continued improvement after his fusion surgery, and Dr. Guille encouraged him to continue to increase his endurance with walking.  (R. 501, 503).  He rated his back pain at 3/10.  (R. 501).  The orthopedist prescribed Percocet at a dosage of 5 mg to be used every four hours as needed.  (R. 503).  Dr. Guile found decreased range of motion.  (R. 501).  The physical therapy examination findings indicated decreased core and lower extremity strength and flexibility, decreased endurance, gait/balance deficits, and mild to moderate low back symptoms.  (R. 494).  Imaging showed post-surgery healing and stable posterior spinal fusion, intact pedicle screw fixation hardware at L4, L5, and S1, satisfactory sagittal alignment and mild thoracolumbar scoliosis, normal mineralization, no acute osseous or soft tissue finding, and no adverse interval finding.  (R. 501, 525-26).  Plaintiff reported to Dr. Taddonio that he was feeling better, that his pain had improved, and that no physical therapy was needed.  (R. 591).  On physical examination, the primary care physician found mild edema over the incision area.  (R. 592).  Dr. Taddonio observed that Plaintiff had exhibited a marked improvement in his chronic back pain and "rarely us[ed]" Percocet.  (R. 596).

Views of the lumbar spine on February 6, 2020, revealed no acute fracture, Plaintiff's status was post decompressive laminectomy with excellent results.  (R. 523).  On the same day, Plaintiff reported to Dr. Guille that he had stopped his home therapy exercises because they were causing increased pain.  (R. 491).  He told the orthopedist that he felt like he was kicked in the tailbone and had "zinging" pains in the buttocks.  (*Id.*).  He rated his pain at a 5/10.  (*Id.*).  Dr. Guille's physical examination showed tenderness to palpation at the left and right SI (sacroiliac)

joints and around the incision, decreased range of motion secondary to pain, and an antalgic gait. (R. 491).  He assessed spondylolisthesis of the lumbosacral region and sacroiliitis and referred Plaintiff for SI joint injections.  (R. 492).

On February 10, 2020, Plaintiff was evaluated by William Cano, M.D., a specialist in physical medicine, pain medicine, and rehabilitation.  (R. 758).  Plaintiff reported constant, aching, and sharp sacrum pain with radiation to the buttocks, rated at a 5/10, that worsened with activity and improved with rest.  (*Id.*).  On physical examination, Plaintiff had tenderness to palpation of the SI joint bilaterally; Plaintiff's lumbar spine active flexion, extension, left lateral flexion, right lateral flexion, and rotation to the left and right were restricted and painful; and he had a positive slump test.  (R. 759).  Dr. Cano assessed post-laminectomy syndrome, lumbar, lumbar canal stenosis, and inflammation of the SI joint.  (*Id.*).  He administered a bilateral SI joint injection on February 12, 2020, trigger point injections in the lumbar area on February 20, 2020, and a bilateral L5 transforaminal epidural steroid injection on April 27, 2020.  (R. 763, 765-66).  Dr. Cano also assessed lumbosacral neuritis.  (*Id.*).

On June 17, 2020, Plaintiff was examined by neurosurgeon John Weaver, M.D.  (R. 497).  He reported persistent lower back pain on the right side with no radiation.  (*Id.*).  Dr. Weaver assessed back pain without sciatica and status post lumbar spinal fusion and indicated that the pain could be "because he is not yet fused."  (R. 497-98).  On June 29, 2020, Plaintiff underwent another steroid injection and reported that he had 65% pain relief since his last injection.  (R. 761).  Plaintiff stated to Dr. Taddonio on November 4, 2020 that his daily level of chronic back pain was a 5-6/10.  (R. 635).  The primary care physician found that Plaintiff had spasms, tenderness, and bony tenderness in his lumbar back, mild edema over the incision area, and decreased range of motion.  (R. 637).  On March 10, 2021, Plaintiff rated his pain at a 5/10, and Dr. Taddonio's physical examination yielded similar findings to the results of the November

5

2020 examination. (R. 817-19).

From March 16, 2021 to June 17, 2021, Christopher Dankmyer, M.D., a pain medicine specialist, treated Plaintiff's chronic low back pain. (R. 712-56). Over the course of his treatment with Dr. Dankmyer, Plaintiff rated his pain at 42-78/100, 5-7/10, 40-60/100, and 50-80/100. (R. 712, 715, 719, 727). He indicated that he had tried surgical fusion, physical therapy, and injections, which did not seem to help. (R. 712). The physical examinations showed decreases in the range of motion of his lumbosacral spine and hip range of motion with complaints of crepitus, a significant reduction in flexion extension and rotation, tenderness over the SI joints bilaterally and the paraspinal muscles bilaterally, a questionably positive straight-leg raise with increased back pain palpating over the SI joint with increased pain with lateral bending and rotation, and some lumbar paraspinal muscle discomfort and tenderness with range of motion of the knees. (R. 713, 716, 720, 724, 728). Dr. Dankmyer assessed post-laminectomy syndrome; sprain of sacroiliac joint; intervertebral disc displacement, lumbosacral region; bilateral primary osteoarthritis of knee; pain in right knee; myalgia; chronic pain syndrome; spondylosis, lumbar region; radiculopathy, lumbar region; radiculopathy, lumbosacral region, and paresthesia of skin. (R. 713, 717, 721). X-rays taken on March 19, 2021 showed postsurgical and mild degenerative changes of the lumbar spine, unremarkable SI joints, and very mild degenerative changes of both knees. (R. 747). Electromyogram (EMG) and nerve conduction studies conducted on March 22, 2021 suggested a possible S1 lumbar radiculitis/radiculopathy with no evidence of entrapment or peripheral neuropathy or myopathy. (R. 753). On April 16, 2021, Plaintiff was administered a bilateral SI joint injection. (R. 719). Additional joint and steroid injections were administered on April 22, 2021 and May 7, 2021. (R. 734, 756). On June 3, 2021, Plaintiff underwent bilateral L2, L3, and L4 medial branch blocks and a L5 dorsal ramus block. (R. 738). Dr. Dankmyer prescribed gabapentin, and he

6

subsequently increased the dosage.  (R. 717, 727).  At his June 17, 2021 appointment, Plaintiff

complained that the increased gabapentin dosage was making him feel foggy and tired.  (R. 727).

Dr. Dankmyer reduced the gabapentin and referred Plaintiff to David Lichten, M.D. to be

evaluated for a spinal cord stimulator.  (R. 729).

Amanda Kochan-Dewey, Psy.D., a consultative examiner, conducted a mental status

evaluation of Plaintiff on April 8, 2021.  (R. 698).  Plaintiff denied receiving any mental health

treatment and denied depression, anxiety, phobia, trauma, panic attacks, mania, or thought

disorders.  (R. 699).  His mental status examination was unremarkable.  (R. 699-700).  Plaintiff

reported that he was able to dress and bathe himself, could cook, clean, and do laundry but finds

bending painful, was able to shop and to drive, socialized with others, and watched TV, listened

to music, played games, utilized social media, and tried to go on walks.  (R. 700).  Dr. Kochan-

Dewey made no mental health diagnosis and gave Plaintiff a good prognosis.  (R. 701).

Plaintiff was examined by Dr. Taddonio on July 1, 2021.  (R. 1248).  He said he had

constant back pain, rating its severity at an 8/10.  (R. 1254).  On physical examination, "[h]e is in

acute distress (appears in pain)," had an abnormal and antalgic gait, was unable to sit for a long

period of time, and had to stand and walk around the examination room using a cane.  (R. 1255).

On July 6, 2021, Plaintiff was seen by Dr. Lichten and complained of severe pain rated at 70-90

on a visual analogue scale.  (R. 731).  Lumbar testing was restricted and painful in all directions,

and the seated slump test was negative bilaterally.  (R. 732).  Plaintiff wished to proceed with a

thoracic cord stimulator trial.  (R. 733).  A July 19, 2021 MRI of the thoracic spine returned

normal results.  (R. 745).

On August 21, 2021, Dr. Dankmyer completed a Degenerative Disc Disease Residual

Functional Capacity Questionnaire.  (R. 1181-84).  He opined that, beginning on March 20,

2021, Plaintiff's pain and other symptoms were severe enough to interfere with the attention and

concentration needed to perform even simple work tasks occasionally.  (R. 1182).  Dr. Dankmyer found that Plaintiff could sit two hours and stand twenty minutes at one time, could sit and stand/walk for about four hours in an eight-hour workday, could occasionally lift and carry less than ten pounds, and could rarely lift and carry ten pounds.  (R. 1183-84).  He concluded that Plaintiff did not need to have periods of walking around during an eight-hour working day.  (R. 1183).  Plaintiff required use of a cane or other assistive device for occasional walking or standing, but he did not have to elevate his legs when sitting for prolonged periods of time.  (*Id.*).  The treating pain specialist found that Plaintiff would need to be able to shift positions at will from sitting, standing, or walking and to take one to two unscheduled breaks for two to three minutes.  (*Id.*).  No postural limitations or any restrictions concerning Plaintiff's ability to reach, handle, or finger were assessed.  (R. 1184).  In support of his assessments, the pain specialist reported that Plaintiff had post-laminectomy syndrome, lumbar radiculopathy, and SI joint dysfunction, with a fair prognosis.  (R. 1181).  He indicated that Plaintiff had chronic pain/paresthesia in the back and legs and identified tenderness, muscle spasm, and muscle weakness as positive objective signs for his evaluation.  (*Id.*).  Finally, Dr. Dankmyer stated that Plaintiff had significant limitations of motion, reporting that lumbar extension was 40% and lumbar left rotation, left lateral bending, flexion, right rotation, and right lateral bending were 50%.  (R. 1182).

### B.   Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated September 28, 2020, Plaintiff reported that he is in constant pain; he is unable to bend, lift, twist, or tilt; kneeling, bending, standing, and sitting increases the pain; after standing or walking for thirty to forty-five minutes, he must rest by sitting or lying down; and lying down does not take the pain away completely.  (*Id.*).  He described his daily activities as including: lying down,

8

making breakfast and lunch for himself and his children, helping with his children's homeschooling lessons, performing chores, helping his wife run errands, watching TV, and assisting with dinner.  (R. 336-37).  The severe pain interferes with his sleep and his ability to dress himself.  (*Id.*).  He acknowledged that he needed reminders to take new medicine.  (R. 337).  Plaintiff reported that he gathers laundry, sweeps, rakes the lawn, cleans windows, prepares simple meals, and performs other household chores.  (*Id.*).  He sometimes needs help or encouragement to perform these tasks, the pain limits his movements and how long he can stand, he has difficulty bending over, and he needs to take a break after about five to twenty minutes.  (*Id.*).  He goes outside every day, and he drives and occasionally shops.  (R. 338).  Plaintiff described his hobbies as walking and fishing, but stated that his pain interferes with his ability to do either activity.  (R. 339).  He goes to church, the grocery store, and friends' houses once a week or every other week, and he occasionally needs to be reminded to go places.  (*Id.*). Plaintiff checked boxes on the form indicating difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing.  (R. 340).  He can walk a one-quarter to one-half of a mile but then must rest for fifteen to forty-five minutes.  (*Id.*).  Plaintiff indicated that he can only pay attention for fifteen to twenty minutes, does not finish what he starts, is "so, so" on following written instructions, and forgets spoken instructions.  (*Id.*). Furthermore, Plaintiff does not handle stress well, and he does not use an assistive device.  (R. 341).

Plaintiff's wife completed a Third-Party Function Report on September 29, 2020.  (R. 324).  She substantially concurred with Plaintiff's assessment of his conditions, activities, and limitations.  (R. 324-31).  On December 30, 2020, Plaintiff completed another function report together with a Supplemental Function Questionnaire.  (R. 351-61).  The second Adult Function Report is substantially similar to his first Adult Function Report.  (*Id.*).  However, he checked

boxes indicating difficulties completing tasks and concentrating.  (R. 356).  Family members

accompany him when he leaves his home.  (R. 354).  He can only walk for 100 to 200 feet and

then must rest for forty minutes to two hours.  (R. 356).  If he is not in pain, he can pay attention

for thirty minutes to two hours, his ability to follow written instructions is mediocre, and he does

not remember spoken instructions.  (*Id.*).  He can take a shower but not a bath.  (R. 352).

Plaintiff also noted that he uses an unprescribed cane and brace/splint.  (R. 357).  In the attached

questionnaire, Plaintiff identified sharp, achy, shocking and constant pain "zapping like a knife"

in his lower lumbar region, spine, hips, and pelvis, spreading up to his shoulders and down to his

feet.  (R. 359).  The pain levels change throughout the day, and any sort of activity causes pain.

(*Id.*).  The pain began in 2017, although he had suffered from pain issues since his adolescence.

(*Id.*).  He needs to rest all the time, and he has tried physical therapy, pain management

treatment, different medications, a back support/brace, and hot showers.  Nothing has helped,

and he was told to stop physical therapy because it had increased his pain.  (R. 361).  Plaintiff

indicated that he was referred to a psychologist.  (*Id.*).

       At the administrative hearing, Plaintiff testified that he lives with his wife and their four

children.  (R. 44, 68).  In August 2019, he had a back injury, which led to an acute exacerbation

of a previous injury.  (R. 53).  Plaintiff described the pain as throbbing, stabbing, burning, and

radiating down from his lower spine and back to his feet.  (R. 54-55).  It varies in intensity from

a 3/10 to 6-7/10.  (R. 72).  He did not return to work following the injury and went to a specialist

for treatment.  (R. 52-53).  Plaintiff tried physical therapy and underwent a surgical fusion of L4-

L5-S1.  (R. 55-56).  The doctor who performed the fusion stated that "everything looks beautiful

or wonderful," but Plaintiff indicated that surgery provided no long-term improvement in his

pain levels and that the physical therapy actually increased his pain.  (R. 56, 72).  He underwent

a nerve conduction study, which showed radiating pain from his S1 disc.  (R. 58).  Plaintiff has

received steroid, cortisone, and epidural injections and was prescribed gabapentin.  (R. 57-62).

Neither the injections nor the medications have helped, and an increased dosage of gabapentin

caused him to feel drowsy.  (*Id.*).  Plaintiff was scheduled to participate in a "spine stim[ulator]"

trial and had undergone an MRI and a mental evaluation.  (R. 59).

Plaintiff testified that he can sit down for approximately twenty minutes and walk for

twenty to thirty minutes; but he cannot reach over his head or bend over.  (R. 62-64).  He spends

close to 70% of his day lying down, which relieves the pressure and numbing but not the pain.

(R. 64-65).  He tries to walk for twenty minutes a day.  (R. 65).  Plaintiff prepares himself

breakfast and assists his children with the homeschooling lessons prepared by his wife.  (R. 66).

He does not do yardwork, and his wife does most of the grocery shopping.  (*Id.*).  He has been

using a cane for about a year and a half for balance and support.  (R. 67).  Plaintiff drives his

wife to work and to doctor's appointments, but he does not drive for more than twenty to thirty

minutes because sitting any longer aggravates his pain.  (R. 67-68).  He also indicated that he has

difficulties with memory and concentration because of the constant pain.  (R. 68).  He also finds

it difficult to comprehend and follow what others are saying.  (R. 69).


III.   **ALJ'S DECISION**

Following the administrative hearing, the ALJ issued a decision in which she made the

following findings:

1.   The claimant meets the insured status requirements of the Social Security Act

through December 31, 2025.

2.   The claimant has not engaged in substantial gainful activity since August 11,

2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: degenerative disc disease of

the lumbar spine and degenerative joint disease of the knees (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except he can stand and/or walk for up to 4 hours per day for up to 20 minutes at one time; he can sit for up to 4 hours per day for up to 2 hours at one time; he can occasionally lift and/or carry no more than 10 pounds and frequently lift and/or carry negligible weights (such as a pen); he can occasionally climb ladders or scaffolds and stoop; and he can frequently perform all other postural maneuvers; and he must avoid concentrated exposure to vibration.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on July 23, 1984 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

12

economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security

Act, from August 11, 2019, through the date of this decision.  (20 CFR

404.1520(g)).

(R. 14-32).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 33).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that he cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits his physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform his past work.  If the
> claimant cannot perform his past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4).  The

disability claimant bears the burden of establishing steps one through four.  If the claimant is

determined to be unable to resume previous employment, the burden shifts to the Commissioner

at step five to establish that, given the claimant's age, education, work experience, and mental

and physical limitations, he is able to perform substantial gainful activities in jobs existing in the

national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

       Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *See, e.g.*, *Hartranft v. Apfel*, 181 F.3d 358, 360

(3d Cir. 1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence

as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112,

118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion,

the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.

*See, e.g.*, *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The Court exercises plenary

review over legal issues.  *See, e.g.*, *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir.

1999).  Furthermore, the Commissioner may not offer "a post-hoc rationalization" or justification

because "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's

decision." *Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) (quoting *Keiderling v.*

*Astrue*, No. 07-2237, 2008 WL 2120154, at *3 (E.D. Pa. May 20, 2008)).


## V.    DISCUSSION

       In his request for review, Plaintiff raises one claim: the ALJ's RFC is contrary to law and

not supported by substantial evidence because the ALJ did not properly evaluate the medical

opinion of his treating pain specialist, Dr. Dankmyer.  (Pl.'s Br., ECF No. 9, at 1-11).

       The Commissioner modified the Social Security regulations in 2017, changing the way

ALJs evaluate medical evidence.  The prior regulations, which govern claims filed before March

27, 2017, divided medical sources into three categories:  treating, examining, and non-examining.

*See* 20 C.F.R. § 404.1527.  ALJs were to weigh each medical opinion and could sometimes afford

controlling weight to opinions from treating sources.  *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion.  *See* 20 C.F.R. § 404.1520c(a).  Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding.  *See id.*  Five factors determine persuasiveness:  (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(c).  Supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).  The ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [her] determination or decision."  *Id.*  The ALJ need not explain her determinations regarding the other factors, but she must discuss supportability and consistency.  *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

It is well established that an ALJ is free to reject a medical source opinion but in so doing

must indicate why evidence was rejected so that a reviewing court can determine whether

"significant probative evidence was not credited or simply ignored." *Chandler v. Comm'r of*

*Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

While an ALJ's decision need not discuss "every tidbit of evidence included in the record," *Hur*

*v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004), it must still consider all pertinent medical and

non-medical evidence and "explain [any] conciliations and rejections," *Burnett*, 220 F.3d at 122.

Accordingly, "[t]he ALJ must provide a 'discussion of the evidence' and an 'explanation of

reasoning' for [her] conclusion sufficient to enable meaningful judicial review." *Diaz v. Comm'r*

*of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (quoting *Burnett*, 220 F.3d at 120).

The ALJ summarized and evaluated Dr. Dankmyer's medical opinion as follows:

> Dr. Dankmyer prepared an opinion on August 21, 2021 in
> which he found that beginning on March 20, 2021, the claimant's
> experience of pain or other symptoms was severe enough to
> interfere with attention and concentration needed to perform even
> simple work tasks occasionally ([R. 1182]).  He found that the
> claimant could sit 2 hours at one time and stand 20 minutes at one
> time.  He opined that the claimant could sit about four hours and
> stand/walk about four hours in an eight-hour working day.  ([R.
> 1183]), and did not need to use a cane.  He found that the claimant
> needed a job that permitted shifting positions at will from sitting,
> standing, or walking.  He opined that the claimant would need to
> take unscheduled two- to three-minute breaks one to two times
> during an eight-hour working day.  He found that the claimant
> could lift and carry less than 10 pounds occasionally and 10
> pounds rarely.  This opinion is well supported by Dr. Dankmyer's
> explanation for his opinion.  He reported that the claimant had
> post-laminectomy syndrome, lumbar radiculopathy, and SI joint
> dysfunction ([R. 1181]).  He reported that the claimant's prognosis
> was fair.  He reported that EMG showed radiculopathy.  He
> reported that that claimant had chronic pain/paresthesias in his
> back and legs.  He reported that the claimant had objective signs of
> tenderness, muscle spasm, and muscle weakness.  He reported that
> lumbar extension was 40 percent and lumbar left rotation, left
> lateral bending, flexion, right rotation, and right lateral bending
> were 50 percent ([R. 1182]).  This opinion is partially consistent
> with the other evidence of record.  In particular, I find that the
> claimant has had the above-defined residual functional capacity
> since he stopped working on August 11, 2019.  In addition, the

> claimant also has postural limitations due to his degenerative disc
> disease of the lumbar spine and his degenerative joint disease of
> the knees.  Therefore, Dr. Dankmyer's opinion is found to be
> persuasive in pertinent part.

(R. 30).

Plaintiff argues that the ALJ failed to provide the required "logical bridge" between her

ultimate RFC assessment and her "unspoken" rejection of Dr. Dankmyer's opinion concerning

Plaintiff's impaired concentration and attention and his need to sit and stand at will and to take

unscheduled breaks.  (Pl.'s Br., ECF No. 9, at 10).  He contends that the record was patently

consistent with and supported the treating specialist's opinion.  (*Id.* at 7-10).  Despite finding the

opinion persuasive in pertinent part, well-supported, and partially consistent with other evidence

in the record, the ALJ purportedly failed to discuss or account for all of the non-exertional

limitations described in the medical opinion.  (*Id.* at 7-10).  Plaintiff asserts that the ALJ thereby

failed to explain why such limitations were inconsistent or unsupported in such a way as to make

meaningful judicial review possible.  (*Id.* at 10-11).  The Acting Commissioner responds that the

ALJ, reading her decision as a whole, adequately articulated her consideration of the

supportability and consistency factors.  (Def.'s Br., ECF No. 12, at 6-11).  The Court agrees with

Plaintiff that the ALJ did not satisfy her obligation to provide an explanation for how she

considered the consistency factor "sufficient to enable meaningful judicial review."  *See Diaz*,

577 F.3d at 504.

The ALJ explained that the medical opinion was "well-supported" by the treating pain

specialist's own "explanation" for his opinion.  (R. 30).  Despite her unqualified "supportability"

finding, the ALJ ultimately found that the opinion was only persuasive in pertinent part because

it was "partially consistent with the other evidence of record."  (R. 30).  Given the absence of

any limitations for concentration, attention, shifting positions, or unscheduled breaks in the RFC,

the ALJ implicitly rejected Dr. Dankmyer's "well-supported" opinion concerning such

17

limitations on consistency grounds.  (R. 18-19, 30).  However, an ALJ must "explain" how she

considered both supportability *and* consistency.  *See, e.g.*, § 404.1520c(b)(2), 404.1520c(c)(1)-

(2).

      The ALJ did not explain why Dr. Dankmyer's assessments concerning Plaintiff's

concentration and attention and her need to sit and stand at will and to take unscheduled breaks

were inconsistent with the other medical and non-medical evidence.  She did not mention these

findings by the treating specialist in her "consistency" discussion.  Instead, she merely stated that

Plaintiff had "the above-defined RFC" since he stopped working on August 11, 2019 and that he

had other (more restrictive) postural limitations due to his degenerative disc and knee diseases.

(*Id.*).  The ALJ indicated that Dr. Dankmyer's assessed limitations were "partially" inconsistent

with the RFC assessed by the ALJ.  (*Id.*).  But she did not identify any alleged inconsistencies.

General conclusions concerning the Plaintiff's RFC are not sufficient to satisfy the ALJ's

obligation under § 404.1520c(b)(2) to explain how she considered the consistency of a medical

opinion with the evidence from other sources in the record.  Furthermore, the ALJ's decision

"puts the cart before the horse" by improperly treating Plaintiff's "above-defined RFC" as a

settled fact rather than something that was being shaped by the ALJ's consideration of each piece

of evidence, including Dr. Dankmyer's opinion.  *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.

2012) (stating that such an approach raises "[a]n obvious problem[ ]" because "the ALJ's

findings of residual functional capacity is not 'above' in the opinion but is yet to come," and

treating it otherwise fails in the responsibility to make "the determination of capacity . . . based

on the evidence . . . rather than forcing the [evidence] into a foregone conclusion."); *see also*

*Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 10248439, at *10 (M.D. Pa. Mar. 14, 2014) (citing

*Filus*, 694 F.3d at 868).

      The Acting Commissioner argues that the ALJ reasonably addressed the supportability

and consistency factors together with the overall persuasiveness of the medical opinion because "the new regulations reflect a 'reasonable articulation standard' that 'does not require written analysis about how [the adjudicator] considered each piece of evidence[;]' rather, the decision need only 'allow a subsequent reviewer . . . to trace the path of an adjudicator's reasoning.'" (Def.'s Br., ECF No. 12, at 8-9) (quoting 82 Fed. Reg. 5844-01, at 5858).  She also notes that the regulations "emphasize 'source-level' articulation, where the persuasiveness of the medical source is evaluated rather than each medical opinion individually."  (*Id.*) (citing 20 C.F.R. § 404.1520c(b)(1)).  However, "[w]hile [it is certainly the case that the applicable regulation requires only 'source-level articulation'], the new regulations have not upended the established demands of the substantial evidence standard which requires that any rejection of relevant evidence be explicit so as to be reviewable." *Prodin v. Kijakazi*, No. 20-1372, 2022 WL 973703, at *5 n.2 (M.D. Pa. Mar. 31, 2022) (citing *Cotter*, 642 F.2d at 706-07).  The ALJ failed to provide an adequate explanation that would permit this Court to review her consideration of the consistency or inconsistency of Dr. Dankmyer's proffered limitations on concentration and attention, shifting positions at will, and unscheduled breaks with the other medical and non-medical evidence in the record.  In fact, the ALJ did not articulate on a "source-level" basis her consideration of Dr. Dankmyer's overall opinion.  Instead, her entire "consistency" discussion consisted of nothing more than an inadequate reference to the "above-defined" RFC and the statement that Plaintiff had postural limitations because of her degenerative disorders.  (R. 30).

The Acting Commissioner also argues that the ALJ's evaluation of the treating pain specialist's opinion, when the ALJ's decision is read "as a whole," does not frustrate meaningful review.  (Def.'s Br., ECF No. 12, at 9) (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)) (holding that no "particular language" was required in setting forth conclusion that the plaintiff's conditions did not meet a listing at step three).  She notes that, earlier in the decision,

the ALJ stated that the overall record supported certain limitations but not disabling symptoms, and thoroughly summarized medical evidence.  (*Id.*) (citing R. 20-22, 413. 427, 433, 491, 505-07, 509-12, 524, 561, 574, 596, 638-39).  The ALJ then purportedly provided an in-depth explanation for why Plaintiff's RFC was limited to a restricted range of sedentary work.  (*Id.*). As the Acting Commissioner notes, the ALJ concluded in her overall RFC assessment that Plaintiff could perform limited sedentary work because of his generally normal physical examination findings and because he reported that he drives, walks for thirty minutes per day, performs a variety of other daily activities, and does not have any side effects from his medications.  (*Id.* at 9-10) (citing R. 26, 335-42, 358, 517-18, 609, 1183).  The ALJ also observed that Dr. Dankmyer opined that Plaintiff did not require a cane for ambulation.  (*Id.* at 10) (citing R. 509, 517-18, 1183).  The ALJ did not assess any mental limitations given Plaintiff's generally normal mental status examinations.  (*Id.*) (citing R. 27).

However, the ALJ did not proffer Plaintiff's generally normal physical examination and mental status findings, his daily activities, or the fact that the pain specialist stated that Plaintiff did not require use of a cane for ambulation as reasons for  discounting Dr. Dankmyer's opinion regarding Plaintiff's impaired attention and concentration and his need to shift positions and take unscheduled breaks.  Accordingly, the Acting Commissioner's arguments must be rejected as nothing more than improper post-hoc rationalizations.  *See, e.g.*, *Schuster*, 879 F. Supp. 2d at 466.  In fact, the ALJ did not identify any specific "evidence from other medical and nonmedical sources" as part of her "consistency" assessment; instead, she merely proffered general statements concerning postural limitations and the "above-defined" RFC, which were not sufficient to satisfy the ALJ's obligation to explain how she considered the consistency of a medical opinion to permit this Court to conduct a meaningful review of her decision.  (R. 30); § 404.1520c(b)(2); *Diaz*, 577 F.3d at 504.  The reader should not be left to draw his or her own

conclusions concerning the consistency or inconsistency between the medical opinion and the specific evidence from other medical and nonmedical sources in the claim.  *See* 82 Fed. Reg. 5844-01, at 5858 (a reviewing court must be able "to trace the path of an adjudicator's reasoning").

Finally, the Acting Commissioner contends that, given the ALJ's thorough discussion of her reasoning for the assessed RFC earlier in the decision, Plaintiff is unable to establish that, absent the alleged error in articulation, the outcome of the ALJ's decision would have changed. (Def.'s Br., ECF No. 12, at 10-11).  However, the Acting Commissioner does not dispute Plaintiff's assertion that Dr. Dankmyer's opinion established far greater limitations than the ALJ's RFC, which, if credited, would have established that he was disabled.  (Pl.'s Br., ECF No. 9, at 6-7).  Furthermore, there may be good reasons for the ALJ to discount Dr. Dankmyer's assessed limitations concerning Plaintiff's attention and concentration and his need to shift positions and to take unscheduled breaks, but neither the Acting Commissioner nor this Court can provide them for her after the fact.  *See Nichols v. Colvin*, No. 14-01755, 2015 WL 5255245, at *4 (W.D. Pa. Sept. 9, 2015) ("Although there may be grounds . . . to support the ALJ's conclusions, it is not [the Court's] role to seek out such grounds and justify the ALJ's decision post-hoc.  Although this approach may appear to elevate form over substance, the requirement that an ALJ adequately explain his decision is not a technicality."); *Schuster*, 879 F. Supp. 2d at 466.  The record included medical and non-medical evidence that, if the ALJ had meaningfully considered in evaluating the consistency of the medical opinion, may have resulted in a different conclusion concerning the opinion's persuasiveness.  For instance, the physical examinations included several findings of decreased range of motion, stiff or antalgic gait, lumbar spasms, tenderness to palpation at the SI joints, decreased core and lower extremity strength and flexibility, and decreased endurance.  (*See, e.g.*, R. 20-26, 491, 493-94, 505-13, 501, 515).  After

he had undergone fusion surgery, received several injections, tried physical therapy, and was prescribed gabapentin, Plaintiff was examined by Dr. Taddonio on July 1, 2021. (R. 25, 71, 72). At that time, he appeared to be in acute distress with abnormal and antalgic gait, could not sit down, and had to stand and walk around the examination room with a cane. (R. 25, 71-72). As for the non-medical evidence, Plaintiff reported in his initial function report that he is able to pay attention for no more than fifteen to twenty minutes due to pain. (R. 19-20, 340). He testified at the administrative hearing that the lumbar fusion surgery, injections, physical therapy, and pain medications did not provide him any lasting relief, and as of the date of the hearing, Plaintiff was scheduled to participate in a "spine stim" trial. (R. 19-20, 55-62). He also indicated that he has difficulties with memory and concentration because of the constant pain. (R. 68). Accordingly, I find that the ALJ's failure to explain how she evaluated the consistency of Dr. Dankmyer's opinion cannot be considered harmless error.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **GRANTED**. This matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge